United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

W.W.,

                    Plaintiff,

        v.

KILOLO KIJAKAZI,

                    Defendant.

Case No.  19-cv-03343-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 31, 35

## I.      INTRODUCTION

Plaintiff W.W.[1] brings this action challenging the final decision of Defendant Kilolo Kijakazi,[2] Acting Commissioner of Social Security (the "Commissioner"), denying W.W.'s application for disability benefits.  The parties filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, W.W.'s motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for further administrative proceedings consistent with this order.[3]

## II.     BACKGROUND

### A.     Education and Employment History

W.W. was born on February 15, 1955.  Administrative Record ("AR," dkt. 24) at 221.  She has a high school diploma and has completed vocational training in banking.  *Id.* at 293.  She testified that she worked in the banking industry for over thirty years.  *Id.* at 46.  She worked as a

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Kijakazi became Acting Commissioner while this case was pending and is therefore automatically substituted as the defendant under Rule 25(d) of the Federal Rules of Civil Procedure.

[3] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    bank teller, a financial service representative, and an accounting specialist. *Id.* at 46, 293. She

2    testified that she began losing jobs in 2001, either having been fired or having quit "on the verge

3    of getting fired" from a number of jobs. *Id.* She testified that she was unable to maintain pace and

4    understand new technology, and "didn't have the functions to do [her] job anymore." *Id.* She has

5    been unemployed since 2015. *Id.* at 46.

6       **B.   Medical History**

7          This summary focuses on the evidence cited by the parties and relevant to the resolution of

8    the present motions and is not intended as a complete recitation of the administrative record or

9    W.W.'s medical history. W.W. alleges disability based on a mental impairment of depression and

10   a physical impairment of pre-diabetes.

11          **1.   Mental Impairment**

12         On July 3, 2013, Dr. John Prosise, Ph.D., administered a mental status evaluation. *Id.* at

13   434. Dr. Prosise concluded that W.W.'s psychological capabilities were all unimpaired but could

14   not assess her ability to carry out complex tasks and decisions. *Id.* at 436. Dr. Prosise noted that

15   W.W. uses public transportation and manages her own finances. *Id.* Dr. Prosise diagnosed the

16   following mood disorders: (1) Depressive Disorder NOS; (2) Factitious Disorder, Psychological;

17   and (3) Somatization Disorder. *Id.* at 435.

18         On November 10, 2014, Dr. Raymond Friedmann, M.D., Ph.D., QME, conducted a file

19   review of W.W. for Prudential Insurance Company in connection with her long-term disability

20   claim. *Id.* at 490. Dr. Friedmann summarized a November 4, 2014 telephone conference with Dr.

21   Sharon Jones, M.D., who had been W.W.'s primary care physician. *Id.* at 491. Dr. Jones noted

22   that she "did not have a clear recollection" of W.W. and based her comments on her written notes.

23   *Id.* Dr. Jones stated that W.W. "required chronic use of an antidepressant medication to stay

24   stable" and that she had difficulty learning new things. *Id.* Dr. Jones explained that W.W. had

25   first been diagnosed with Major Depression while working and only stabilized after leaving work

26   on disability. *Id.*

27         On July 6, 2016, W.W. established care at Lifelong Medical Care. *Id.* at 582. Her chart

28   notes indicated that W.W. had been seeing a therapist for depression until she lost her insurance.

1    *Id.*  The charts further noted that she was not working because of physical pain and depression,

2    and had difficulty concentrating and initiating sleep.  *Id.*  W.W. also stated that her antidepressants

3    made her "more tired" and caused her to need disability.  *Id.*  The treating Physician Assistant,

4    Paterson Rene, assessed "Recurrent major depressive disorder."  *Id.* at 584.  PA Rene prescribed

5    several medications, including Sertraline.  *Id.* at 586.

6         On August 24, 2016, W.W. returned to Lifelong Medical Care and began weekly therapy

7    with Tenzin Youdon, LCSW.  *Id.* at 569, 737.  W.W. reported feelings of depression for the past

8    eleven years.  *Id.* at 569.  LCSW Youdon noted that W.W.'s depression had impacted her work

9    and that W.W. had been forced to retire in 2013.  *Id.*  LCSW Youdon further noted that W.W. was

10   taking psychiatric medication, specifically Sertraline, Bupropion, and Nortriptyline.  *Id.*  LCSW

11   Youdon assessed depressed mood and an "[i]mpaired ability to make reasonable decisions," but

12   noted it was within normal limits.  *Id.* at 570.  LCSW Youdon diagnosed "Major depressive

13   disorder, recurrent, moderate" and "Anxiety disorder."  *Id.* at 571.

14        On September 14, 2016, LCSW Youdon noted W.W.'s mood was "a little down" and that

15   W.W. had trouble sleeping.  *Id.* at 563.  On September 28, 2016, LCSW Youdon noted that W.W.

16   was depressed.  *Id.* at 561.  LCSW Youdon saw W.W. three additional times that year and

17   assessed major depressive disorder and anxiety disorder at all three visits.  *Id.* at 554, 548, 636.

18   On February 13, 2017, LCSW Youdon noted that W.W.'s mood was "down" and that she had

19   "low energy."  *Id.* at 624.  LCSW Youdon assessed "[i]mpaired ability to make reasonable

20   decisions," but "[w]ithin normal limits."  *Id.* at 625.  LCSW Youdon marked no hallucinations and

21   noted that W.W.'s thought process was logical and her speech was clear.  *Id.*

22        On February 15, 2017, Dr. Ute Kollath, Ph.D., conducted a mental status evaluation in

23   connection with W.W.'s application for Social Security benefits.  *Id.* at 602–05.  Dr. Kollath

24   diagnosed W.W. with "Unspecified Depressive Disorder" and assessed that W.W. was unimpaired

25   in almost all areas of work-related abilities.  *Id.* at 605.  Dr. Kollath assessed that W.W. was

26   mildly impaired only in her "[a]bility to maintain adequate pace or persistence to perform . . .

27   [c]omplex tasks."  *Id.*  Dr. Kollath assessed that W.W. "should have no functional disruption due

28   to a cognitive disorder," but noted that W.W. was "mildly impaired" in her emotional and

United States District Court
Northern District of California

3

1    functional test results.  *Id.* at 604.  Dr. Kollath further assessed that W.W.'s prognosis was "[g]ood

2    with comprehensive mental health services."  *Id.*

3        In March of 2017, Drs. A. Cepeda, MD, and E. Bergmann-Harms, PhD, reviewed W.W.'s

4    treatment records but did not treat or examine W.W.  *Id.* at 128–53.  Drs. Cepeda and Bergmann-

5    Harms determined that W.W. had "Depressive, Bipolar and Related Disorders" and concluded that

6    W.W. had no severe mental impairments.  *Id.* at 149.  These findings were reviewed and affirmed

7    by Drs. L. Arnold, MD, and Dan Funkenstein, MD, in July of 2017.  *Id.* at 150, 153.  Neither of

8    those doctors treated or examined W.W.  *Id.*

9        On May 10, 2017, LCSW Youdon noted that W.W.'s mood was "sleepy" and that she had

10   been "staying inside for a week."  *Id.* at 644.  LCSW Youdon conducted a mental status exam and

11   W.W. scored a 16 on the PHQ-9, which LCSW Youdon interpreted as "Moderately severe

12   depression."  *Id.*

13       After a year of treatment, PA Rene wrote in a June 3, 2017 letter that W.W. was seeing

14   LCSW Youdon for her recurrent major depression and anxiety.  *Id.* at 643.  PA Rene assessed that

15   W.W.'s chronic abdominal pain complicated her psychiatric health.  *Id.*  PA Rene noted that W.W.

16   would "benefit from continued intensive therapy," and concluded that "at this point [W.W.] would

17   not be able to manage a job."  *Id.*

18       On August 14, 2017, LCSW Youdon noted that W.W. "wakes up in a bad mood" and that

19   her "patience is short."  *Id.* at 719.  LCSW Youdon further noted that W.W. was irritable "over

20   little things" and got into a "heated argument with [her] hair dresser."  *Id.*  LCSW Youdon

21   conducted a mental status exam and noted that W.W.'s insight and judgment were good and that

22   she did not present any signs of mania, although her mood and affect were depressed and teary.

23   *Id.*  W.W. scored a 20 on the PHQ-9,[4] which LCSW Youdon interpreted as "Severe depression."

24   *Id.*  W.W. also scored an 18 on the GAD-7.  *Id.*

25       On September 20, 2017, PA Rene increased W.W.'s Sertraline prescription to 100 mg.  *Id.*

26   at 711.  PA Rene noted that W.W. was compliant with her medication and that her Sertraline

27

28   [4] The PHQ-9 is the "Patient Health Questionnaire-9 which is a depression questionnaire."  AR at
     756.

United States District Court
Northern District of California

1   prescription had recently been increased to 50 mg after W.W. "felt no improvement any longer"

2   on 25 mg. *Id.* at 709.  On October 23, 2017, W.W. expressed that she felt happy some days and

3   depressed other days. *Id.* at 705.  W.W. reported being an "active person" and was going for

4   walks. *Id.*  She also reported that she had received home improvement loans from the City of

5   Richmond which was "motivat[ing] her to be positive and productive." *Id.*  After a mental status

6   exam, W.W. scored 26 on the PHQ-9 and 21 on the GAD-7, indicating severe depression. *Id.*  On

7   November 20, 2017, W.W. reported feeling tired because she was caring for her cousin's two

8   dogs. *Id.* at 694.

9       On December 11, 2017, Mental Health Clinician ("MHC") Somchith Phongboupha

10  conducted a clinical assessment of W.W. *Id.* at 735.  MHC Phongboupha noted that W.W. had

11  been on Nortriptyline and Setraline for five years to treat her depression and anxiety. *Id.*  W.W.

12  reported that she was "[d]epressed, amotivated, low interest in things, poor energy, variable

13  appetite and sleep, poor concentration, [and] forgetful." *Id.* at 738.  W.W. also reported passive

14  suicidal ideation. *Id.* 735.  MHC Phongboupha noted that W.W. smoked cigarettes daily and

15  smoked marijuana occasionally. *Id.*  MHC Phongboupha assessed severe functional impairment

16  in employment performance and recreational/leisure activities, and moderate functional

17  impairment in social relations. *Id.* at 737.  MHC Phongboupha assessed "mild" impairments in

18  other aspects of W.W.'s life, including substance abuse, physical health, and family relations. *Id.*

19  MHC Phongboupha further assessed that W.W.'s mood and affect were depressed and anxious.

20  *Id.*  MHC Phongboupha diagnosed "Unspecified depressive disorder." *Id.* at 738.

21      On December 18, 2017, W.W. reported to LCSW Youdon that her stress was high and that

22  "she was doing a lot and then crashed." *Id.* at 692.  She reported that her niece was now handling

23  the home modifications because she felt it was "too much for her." *Id.*  LCSW Youdon assessed

24  that W.W. was teary and her mood and affect were depressed. *Id.*  W.W. scored 23 on the PHQ-9

25  and 19 on the GAD-7, indicating severe depression. *Id.*

26      On January 3, 2018, W.W. met with Dr. Mariposa McCall, MD, a psychiatrist, for an

27  initial psychiatry visit. *Id.* at 739.  Dr. McCall reported that W.W. came in to adjust her

28  antidepressants. *Id.* at 740, 742.  Dr. McCall noted that W.W. was depressed and anxious, and that

United States District Court
Northern District of California

5

she had passive suicidal ideation. *Id.* at 741. Dr. McCall further noted that W.W.'s impulse control and judgment were "poor at times." *Id.* Dr. McCall increased her antidepressant prescription to 100 mg and recommended continued therapy. *Id.* at 742. On January 10, 2018, LCSW Youdon reported that W.W. was feeling "more depressed than ever." *Id.* at 686. W.W. scored 23 on the PHQ-9 and 15 on the GAD-7, indicating severe depression. *Id.* Later that month, Dr. McCall and W.W. discussed adjusting her antidepressants, and Dr. McCall recommended transitioning to Prozac. *Id.* at 744. Dr. McCall noted that W.W. was not "fully adherent" to her medication. *Id.* at 745. Dr. McCall reported "[n]o improvement so far." *Id.* Dr. McCall switched W.W.'s medication to Cymbalta in March. *Id.* at 748. Dr. McCall noted W.W.'s marijuana usage and assessed that W.W. may use less once her mood improves. *Id.* In May of 2018, W.W. reported no improvement despite the new medication. *Id.* at 750. Dr. McCall noted that W.W. continued to isolate herself. *Id.* Dr. McCall also noted that W.W. reported feeling depressed and irritable. *Id.* Dr. McCall increased W.W.'s Cymbalta prescription to 60 mg. *Id.* at 753.

After almost two years of weekly therapy, LCSW Youdon documented in a May 1, 2018 letter a diagnosis of Major Depression Recurrent Moderate and Anxiety Disorder. *Id.* at 732. LCSW Youdon noted W.W.'s long history of depression and anxiety and that W.W. had been forced to retire due to her physical and mental problems. *Id.* LCSW Youdon assessed that W.W. struggles with motivation and concentration, which negatively impacts her mood. *Id.* LCSW Youdon reported that W.W. takes her prescribed psychiatric medication but concluded that W.W. is "unable to fully participate and function in the workforce and [is] unable to follow instructions to do her job as required." *Id.*

After almost five months of treatment for a total of four visits, Dr. McCall documented in a May 2, 2018 letter diagnoses of "Major Depression, Recurrent, Most Recent Episode severe without psychosis" and Post Traumatic Stress Disorder ("PTSD"). *Id.* at 756. Dr. McCall wrote that W.W.'s high score on the PHQ-9 indicated a severe degree of depression symptoms and also wrote that W.W. received a high score on the PTSD questionnaire. *Id.* Dr. McCall noted multiple traumas in W.W.'s life. *Id.* Dr. McCall further noted the following:

> Despite good medication adherence and medication adjustments and changes, [W.W.] continues to report feeling very depressed, anxious, irritable, amotivated, with little interest in things, isolating because is easily annoyed. She feels tired, has poor concentration, and is forgetful. Tasks take longer to complete and consistency has been hard to maintain. She is hypervigilant, hyperaroused, has trouble relaxing, has distressing memories of past traumas, has difficulty trusting others, and tends to isolate[].

*Id.* Dr. McCall further noted that W.W.'s mental health symptoms are complicated by her "ongoing pain issues [which] further limit her abilities to engage with others and complete tasks consistently and timely." *Id.* Dr. McCall wrote that W.W. "has used marijuana to cope with her mental health symptoms and physical pain" and noted that W.W. has made efforts to limit her use of alcohol and marijuana. *Id.*

### 2.   Physical Impairment

On September 7, 2016, medical records documented a diagnosis of pre-diabetes. *Id.* at 565. On December 14, 2016, W.W. was examined by Dr. Alison Cook, DPM, for a diabetes follow-up. *Id.* at 631. W.W. reported frequent urination, difficulty walking, and numbness in her extremities. *Id.* at 632. Dr. Cook conducted a physical exam and noted decreased vascular pulses in both feet. *Id.* Dr. Cook also scheduled a follow-up appointment for an "ingrown nail prediabetic." *Id.* at 634.

On February 15, 2017, Dr. Eugene McMillan, MD, conducted an internal medicine evaluation in connection with W.W.'s application for Social Security benefits. *Id.* at 607–11. Dr. McMillan made the following functional capacity assessment:

> She has abdominal pain approximately once a month. She would be able to occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. Standing and walking would be for at least six hours during an eight-hour workday. There would be no limitations on sitting. She does not require an assistive device. She would be able to engage in activities that would require stopping, kneeling and crouching for at least one third of a workday. There would be no limitations with seeing, hearing or speaking. She would have no limitations with reaching in all directions. There would be no limitations with gross or fine manipulations. There would be no environmental limitations for heights, moving machinery, temperatures, chemicals or dust.

*Id.* at 611. In March of 2017, non-treating Drs. Cepeda and Bergmann also determined that W.W.

United States District Court
Northern District of California

1  had "Diabetes Mellitus" and assessed no severe physical impairments.  *Id.* at 149.  These findings

2  were reviewed and affirmed by Drs. Arnold and Funkenstein.  *Id.* at 150, 153.

3        At an October 25, 2017 follow-up appointment with Dr. Cook, W.W. presented with a

4  painful callus, constipation, and frequent urination.  *Id.* at 700–01.  Dr. Cook noted decreased

5  vascular pulses in both feet and poor calf flexibility.  *Id.*  Dr. Cook reported similar findings after a

6  pre-diabetes follow-up appointment on January 17, 2018.  *Id.* at 681–85.

7        **C.    Denial of First Application**

8        W.W. filed a previous application for disability benefits, for which an unfavorable decision

9  was issued on October 28, 2011.[5]  *Id.* at 112.

10       **D.    Denial of Second Application and ALJ's Decision**

11       W.W. filed her second application on February 18, 2013 alleging disabling Depressive

12  Disorder and chronic stomach pain related to a colostomy, sigmoid colon, and the absence of half

13  of her stomach with an onset date of February 16, 2013.  *Id.* at 112–17.  Her second application

14  was denied on April 15, 2013 and upon reconsideration on April 22, 2014.  *Id.* at 112.  On October

15  29, 2015, a hearing was held before ALJ Mary P. Parnow, who heard testimony from W.W., her

16  representative, and a vocational expert.  *Id.* at 112, 122.  Judge Parnow issued an unfavorable

17  decision on January 14, 2016.  *Id.* at 122.  Judge Parnow first noted that the October 28, 2011

18  prior decision "create[d] an ongoing presumption that [W.W.] was able to work beyond the date of

19  that decision (or the adjudicated period)," which could be rebutted by showing a "changed

20  circumstance."  *Id.* at 112–13 (internal quotation marks omitted).  Judge Parnow found two

21  changed circumstances rebutted the presumption: (1) changed age category from "closely

22  approaching advanced age to advanced age," and (2) a new impairment that had not been

23  considered previously.  *Id.* at 113.

24       Judge Parnow found that W.W. had not engaged in substantial gainful activity since

25  February 18, 2013 and concluded W.W. had a severe impairment: "status post bowel construction

26  with colostomy."  *Id.* at 115.  Judge Parnow found that W.W.'s depressive disorder was non-

27

28  _____

[5] The first application and denial are not included in the Administration Record.

United States District Court
Northern District of California

severe because it "causes no more than 'mild' limitation" in the paragraph B criteria. *Id.* Judge Parnow found that the medical record indicated that W.W. was "stable" on her antidepressants and "was feeling better when she was seeing a psychologist and going to group meetings for depression." *Id.* at 120. Judge Parnow further found that W.W. had the residual functional capacity to perform less than the full range of light work and that W.W. could do the following:

> [S]tand and/or walk for 6 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; lift and/or carry 20 pounds occasionally and 10 pounds frequently; can frequently balance; can occasionally bend, squat, crouch and crawl; would be absent from work one day per month; and would be off task 5% of the workday.

*Id.* at 117. Lastly, Judge Parnow found that W.W. was capable of performing past work as a bank teller and a financial customer service representative, which was not precluded by W.W.'s residual functional capacity. *Id.* at 121. Judge Parnow therefore concluded that W.W. was not disabled. *Id.* at 122.

### E.   Third Application and Administrative Hearing

On November 8, 2016, W.W. filed her third application with an onset date of January 12, 2016. *Id.* at 221–22. Her application was denied on March 23, 2017 and upon reconsideration on July 27, 2017. *Id.* at 157–69. On May 18, 2018, a hearing was held before ALJ Kevin Gill, who heard testimony from W.W., her attorney representative, and a vocational expert. *Id.* at 40.

Judge Gill first heard testimony from W.W. about her work history and her medical conditions. *Id.* at 43. W.W. testified that she was not currently working and had not worked since 2015. *Id.* at 46. She testified that she had been in banking for over thirty years and worked as an accounting specialist. *Id.* at 46–47. She testified that her responsibilities include seeking new business, creating reports on new accounts, and closing accounts. *Id.* at 46. Judge Gill then asked W.W. what prevented her from working and W.W. gave the following explanation:

> Right now, I suffer from depression. I also have abdominal pain from surgery. I have problems lifting to a certain extent, bending due to my surgery in my leg. The bladder, I go to the bathroom on a regular basis. I am unable to concentrate, and focus on what any of my supervisors instruct me to do.

*Id.* at 47.

Judge Gill then asked W.W. where she experienced pain. *Id.* W.W. explained that she

United States District Court
Northern District of California

continues to feel pain in her stomach where she had a colostomy bag and where the "colon part of [her] stomach was removed." *Id.* She testified that she continues to have limited bending and lifting. *Id.* at 48. She explained that she could not lift more than fifteen pounds without worsening the pain. *Id.* at 49. When asked if she was able to do household chores, W.W. responded, "Some days, yes, and some days no." *Id.* She explained that when her stomach pain is "overbearing," she takes her medication and sleeps. *Id.* When asked how often this occurred, W.W. testified nine days out of the month. *Id.* W.W. also testified that she could sweep, dust, and do the dishes. *Id.* at 49. W.W. testified that she takes stool softeners and occasionally takes Motrin to manage the pain. *Id.* at 47. W.W. also testified that she is not allowed to use the stove when she is home alone because her last prescribed medication put her to sleep. *Id.* at 50. W.W. testified that she believed she was developing arthritis from her wrist to her elbow and has difficulty gripping and holding things. *Id.* at 48. She testified that she occasionally cannot move several of her fingers. *Id.* She further testified that she was prescribed medication a couple of weeks before. *Id.*

Judge Gill then asked W.W. about her mental impairments. *Id.* at 50–51. W.W. testified that concentration is "[v]ery difficult." *Id.* She stated that she has difficulty focusing and explained that she often has to read a sentence four or five times. *Id.* at 50–51. When asked how she gets along with others, W.W. testified that she does not communicate very well and can become withdrawn. *Id.* at 51. She explained that depression "looks like a life-ending situation." *Id.* She explained that she is "overwhelmed, and exhausted, stressed, and just worr[ies]." *Id.* She testified that she "would love to go back to work, but mentally, and physically, it is not happening." *Id.*

W.W. was then examined her attorney, Rosemary Dady. *Id.* Dady first asked W.W. about her job performance. *Id.* at 52. W.W. testified that she began losing jobs in 2001. *Id.* She testified that she was fired from one job because she "couldn't keep up with the pace." *Id.* She explained that she had been "on the verge of getting fired" from another job when she left to care for her mother. *Id.* After her mother died, W.W. returned to work before becoming sick and requiring surgery. *Id.* When she returned to work again, she had "lost it" and "didn't have the

functions to do [her] job anymore." *Id.*  W.W. explained that she had posted money to wrong

accounts, could not balance numbers, and could not understand reports. *Id.* at 53, 56.  At Wells

Fargo, W.W. was written up because she could not understand her managers and because she was

using the bathroom too often. *Id.* at 54.  She testified that she was not performing well at work

and was making mistakes, including an incident where W.W. had misplaced a customer's money

and the customer's car was almost repossessed as a result. *Id.* at 56–59.  When asked if there were

simpler jobs at the bank that she could perform, W.W. testified that she struggled with the

technology, including drafting letters and emails. *Id.* at 59–60.  She also explained that she could

not lift a bag with $500 worth of quarters because of her abdominal pain. *Id.* at 60–61.

Dady then asked W.W. about her mental impairments. *Id.* at 61.  W.W. testified that she

has been prescribed antidepressants for many years. *Id.* at 62.  She explained that even when she

is on medication, her depression causes her to isolate and stay in bed all day for several days a

month. *Id.* at 62–63.

Finally, Judge Gill questioned Christopher Salvo, the vocational expert. Salvo first asked

W.W. several clarifying questions before classifying her past work as a customer service

representative and a teller. *Id.* at 66.  Judge Gill provided the first hypothetical as follows:

> [A]ssume a hypothetical individual of the claimant's age, and
> education, with the past jobs that you described. Further, [assume[6]]
> this individual is limited to lifting and carrying – what is it, 20 pounds
> occasionally, 10 pounds frequently. Sitting six hours in an eight-hour
> day. Standing and walking six. This individual is limited to frequent
> climbing of ramps and stairs. Frequent climbing of ladders, ropes, and
> scaffolds. And, frequent balance, stoop, kneel, crouch, and crawl.

*Id.* at 67.  Based on the hypothetical, Salvo testified that the hypothetical person could perform

W.W.'s past work as a customer service representative and a teller. *Id.* at 67–68.

In the second hypothetical, Judge Gill added limitations: "this person is further limited to

performing detailed, but non-complex instructions." *Id.* at 68.  Salvo testified that the hypothetical

person could not perform the past duties because the work could be very complex. *Id.*  Judge Gill

asked if there "any transferable skills that would allow this person to do something that was less

---

[6] This word appears as "some" in the original, presumably due to a transcription error.

complex." *Id.* Salvo testified that the hypothetical person could be a gambling cashier with at least 4,000 positions and a check cashier with at least 50,000 positions. *Id.* When asked what skills were transferrable, Salvo responded:

> Basically, dealing with the public in a friendly manner. Explaining the services that the business may offer. Taking in money, making appropriate change. Looking for certain IDs, if they are trying to cash a check, to make sure there is proper ID to verify the person as the individual.

*Id.* at 70. Salvo further testified that the skills were transferable with little vocational adjustment. *Id.* He clarified that there would be "moderate' adjustment to a gaming cashier because of the change in industry and environment. *Id.* As to the second hypothetical, Dady asked Salvo if the hypothetical person could retain their job if they were unable to balance their drawer at the end of the day and were short at least $100. *Id.* Salvo testified that there would be no jobs if this occurred on "an ongoing basis, where once a month she was making a mistake of $100 or more, every month, month after month." *Id.* at 72.

In the third hypothetical, Judge Gill limited the hypothetical individual to "simple, routine tasks." *Id.* at 70–71. Salvo testified that the hypothetical individual could not perform any of the jobs with transferable skills. *Id.* at 71.

Lastly, Dady asked Salvo how many absences per month would be tolerated and Salvo responded with the following:

> It is my belief, that if a person misses a day-and-a-half or more on an ongoing basis, [they] would be let go. While some months, they would be allowed two, maybe three days, but if it was ongoing, continuous, anything over a day-and-a-half a month, would be let go.

*Id.* at 72.

### F.   Legal Background for Determination of Disability

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable to "engage in any substantial gainful activity by any reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if her physical or mental impairments are of such

severity that she is not only unable to do her previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996). Where, as here, the claimant has previously been denied benefits, she must "overcome the presumption of continuing nondisability [by] prov[ing] 'changed circumstances' indicating a greater disability." *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). The "changed circumstances" requirement can be satisfied by a "change in the claimant's age category under 20 C.F.R. 404.1563 or 416.963, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not previously considered, or a change in the criteria for determining disability." Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3. If the presumption is not rebutted, the ALJ must determine that the claimant is not disabled. *Id.*

### 1.    Five Step Framework for ALJ Decisions

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a)(4). At step one, if the claimant has engaged in "substantial gainful activity" during the alleged period of disability, they are not disabled. 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant has not engaged in such activities, the evaluation continues at step two.

At the second step of the analysis, if the claimant has no "severe medically determinable impairment," they are not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). Impairments are severe when there is "more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, they are not disabled; if they have a severe impairment, the evaluation continues to step three.

Next, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets or medically equals the definition of a listed impairment, the claimant is disabled. 20 C.F.R.

§ 404.1520(a)(4)(iii).  If not, the evaluation proceeds to step four.

At step four, if—based on the claimant's residual functional capacity ("RFC")—the claimant can still perform their past work, they are not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations."  20 C.F.R. § 404.1520(a)(1).  If the ALJ finds the claimant can perform their past relevant work, they are not disabled; if they are not able to perform such work, the evaluation moves to step five.

For the fifth and final step, the burden shifts from the claimant to prove disability to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner can identify work that the claimant could perform, they are not disabled; if not, the claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

### 2.    Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a;[7] *see also Segura v. Berryhill*, CV 17-07303-RAO, 2018 WL 5255317, at *12 (C.D. Cal. Oct. 19, 2018) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) ability to understand, remember, or apply information; (2) ability to interact with others; (3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.  20

---

[7] The amendments to the regulations and listings pertaining to mental impairments became effective as of January 17, 2017.  *See* 20 C.F.R. § 404.1520a.  Judge Gill's decision was issued after the effective date, and the new listings were applied.  Since neither W.W. nor the Commissioner address or dispute this application, *see generally* Pl.'s Mot. (dkt. 31-2); Comm'r's Mot. (dkt. 35), the Court applies the standards used in Judge Gill's decision.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   C.F.R. § 404.1529a(b)(2), (c).  Finally, the Commissioner must determine the severity of the

2   claimant's mental impairment and whether that severity meets or equals the severity of a mental

3   impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that

4   the severity of the claimant's mental impairments meets or equals the severity of a listed mental

5   impairment, the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the

6   evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R.

7   § 404.1520a(d)(3).

8   Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

9   presence of various listed mental impairments, but all listed mental impairments share certain

10  "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

11  criteria).  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically

12  determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

13  listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

14  general Paragraph B criteria.  To satisfy the Paragraph B criteria, a mental disorder must result in

15  "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental

16  functioning.  *See id.*  A "marked" limitation is one that is "more than moderate but less than

17  extreme" and "may arise when several activities or functions are impaired, or even when only one

18  is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's]

19  ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.* at

20  12.00C.

21  This evaluation process is to be used at the second and third steps of the sequential

22  evaluation discussed above.  Social Security Ruling ("SSR")[8] 96-8p, 1996 WL 374184, at *4 (July

23

24  _____

25  [8] SSRs, according to the governing regulations, "are binding on all components of the Social
    Security Administration" and "represent precedent[ial] final opinions and orders and statements of
    policy and interpretations" of the Social Security Administration ("SSA").  20 C.F.R.

26  § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of
    SSRs).  "SSRs reflect the official interpretation of the SSA and are entitled to 'some deference as

27  long as they are consistent with the Social Security Act and regulations.'"  *Avenetti v. Barnhart*,
    456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th

28  Cir. 2005)).  SSRs do not carry the "force of law," but they are binding on the ALJs nonetheless.
    *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

2, 1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments."  SSR 96-8p, 1996 WL 374184 at *4.

### G.   Judge Gill's Decision

In his decision issued August 21, 2018, Judge Gill considered whether W.W. was disabled within the meaning of the Social Security Act.  AR at 21–33.  Judge Gill first addressed whether there was "good cause" to justify reopening the prior decision issued by Judge Parnow on January 14, 2016.  *Id.* at 21.  Judge Gill found that because W.W. alleged disability beginning January 12, 2016—an onset date within a previously adjudicated period—her application included an implied request for reopening.  *Id.*  Judge Gill found that there was no good cause to reopen the prior decision.  *Id.*  Judge Gill then applied the five-step analysis and determined that W.W. was not disabled.

#### 1.   Whether Prior Denial of Disability Benefits is Binding

Addressing the implications of W.W.'s prior denial of benefits, Judge Gill found that decision was final and binding.  *Id.* at 22–23.  Judge Gill found that W.W.'s alleged disabilities were "similar but not identical" and therefore necessitated an analysis of the severity of the new alleged impairments.  *Id.* at 24.  Judge Gill found that a new analysis was warranted because the listing for depression had changed since the last decision, her prior severe impairment of "status post bowel construction with colostomy" had decreased in severity, and her residual functional capacity had increased.  *Id.* at 24–25.  He concluded that the presumption of continuing nondisability that arises under *Chavez v. Brown*, 844 F.2d 691 (9th Cir. 1988), based on a prior finding of nondisability was not rebutted.  AR at 24–25.  He nevertheless went on to analyze

16

W.W.'s application under the five-step framework.

At Step One, Judge Gill determined that W.W. had not engaged in substantial gainful activity since the alleged onset date of January 12, 2016.  *Id.* at 25.

At Step Two, Judge Gill found that W.W. suffered from one severe impairment: "status-post remote abdominal surgery."  *Id.*  Judge Gill found W.W.'s Crohn's disease, cataracts, and overactive bladder were not severe impairments.  *Id.* at 25.  Judge Gill explained that the "records do not suggest the conditions have lasted the requisite durational period, are worsening, unresolved, or even more than minimally limit the claimant's ability to perform basic work activities."  *Id.*  Judge Gill found W.W.'s Diabetes Mellitus was not a severe impairment for the following reasons:

> [T]he claimant is not insulin dependent, and the [Diabetes Mellitus] has not resulted in end organ damage, chronic heart failure, amputation or hospitalizations from hypoglycemic shock. There is no retinopathy or neuropathy reported. Overall, there are no indications the claimant's [Diabetes Mellitus] would result in work limitations.

*Id.*  Judge Gill then found that W.W.'s obesity was not a severe impairment because there was no evidence of any difficulty working as a result of her obesity.  *Id.* at 26.

Lastly, Judge Gill found that W.W.'s depression and substance abuse disorder (cannabis) were not severe impairments because they "do not cause more than minimal limitation in the claimant's ability to perform basic mental work."  *Id.* at 26.  Judge Gill determined that the W.W.'s mental impairments caused only "mild" limitations in the four functional areas set forth in Paragraph B criteria in 20 C.F.R. Part 303, Subpart P, Appendix 1.  *Id.*  For the first function area of "understanding, remembering, or applying information," Judge Gill explained that W.W. can attend to personal care without interference, prepare simple meals, perform household chores, drive a car independently, shop for household items, and handle her personal finances.  *Id.*  For the second functional area of "interacting with others," Judge Gill explained that the record was devoid of any evidence of a "history of altercations, evictions, firings due to interpersonal conflicts, fear of strangers, avoidance of interpersonal relationships or personal isolation."  *Id.* at 27.  For the third functional area of "concentrating, persisting, or maintaining pace," Judge Gill explained that W.W. scored well on a mini mental status examination administered by Dr. Kollath,

United States District Court
Northern District of California

1    which indicated that W.W. did not have cognitive work restrictions.  *Id.*  Judge Gill also cited Dr.

2    Kollath's findings that W.W. could focus on work activities and stay on task at a sustained rate.

3    *Id.*  For the fourth and final functional area of "adapting or managing oneself," Judge Gill

4    explained W.W. denied prior psychiatric hospitalizations and noted W.W.'s composure at the

5    hearing.  *Id.*

6              Judge Gill then assessed the opinions of the medical experts as follows:

7                   Great weight is afforded to the opinions of the consultative examiners,
                   John Prosise, Ph.D. and Ute Kollath, Ph.D. as well as the consulting
8                   opinions of E. Bergmann-Harms, Ph.D. and D. Funkenstein, M.D. all
                   of whom conclude the claimant would not have cognitive or social
9                   work limitations from mental impairment . . . . Little weight is
                   afforded to the opinion of Raymond J. Friedman, M.D., Ph.D. who
10                  concluded the claimant would have work limitations from mental
                   impairment . . . . Little weight is also afforded to the treating opinions
11                  of Tenzin Youdon, LCSW and Mariposa McCall, M.D., both of
                   whom advocated work limitations for the claimant due to mental
12                  impairment.

13   *Id.* at 28.  Judge Gill also gave minimal weight to W.W.'s GAF scores because the GAF ratings

14   are not standardized, not designated to predict outcomes, and require supporting detail.  *Id.* at 28–

15   29.  Judge Gill found that W.W.'s depression was not severe "[i]n keeping with the Prior

16   Decision."  *Id.*

17             At Step Three, Judge Gill found that W.W.'s impairments did not meet any listed

18   impairment.  *Id.* at 29.  Judge Gill explained that "[n]o treating or examining licensed physician

19   has mentioned findings equivalent in severity to the criteria of any listed impairment."  *Id.*

20             At Step Four, Judge Gill concluded that W.W. had the "residual functional capacity to

21   perform the full range of medium work as defined in 20 CFR 404.1567(c)."  *Id.*  Judge Gill then

22   assessed the consistency of W.W.'s testimony compared to the evidentiary record and found the

23   following:

24                  [T]he claimant's medically determinable impairments could
                   reasonably be expected to cause the alleged symptoms; however, the
25                  claimant's statements concerning the intensity, persistence, and
                   limiting effects of these symptoms are not entirely consistent with the
26                  medical evidence.

27   *Id.* at 30.  Judge Gill found irrelevant any evidence that predated W.W.'s alleged onset date.  *Id.*

28   Judge Gill found that the medical evidence demonstrated that W.W. could perform the full range

United States District Court
Northern District of California

18

1   of medium work.  *Id.*  Judge Gill noted that W.W. had "unremarkable" and "normal" physical

2   examinations, which he found contradicted her claims of pain.  *Id.*  He noted that, in 2017 and

3   2018, W.W. "had normal range in motion, normal respiratory examination, normal ambulation, no

4   edema and some decrease in deep tendon reflexes."  *Id.*  Judge Gill examined W.W.'s statements

5   to providers.  *Id.*  He noted that W.W. described "doing very well," and reported that she was

6   active, working out, going shopping, and walking.  *Id.*

7         Judge Gill then addressed the consultative examination by Dr. McMillan and concluded

8   that "there were no objective clinical findings that would support greater work imitations in

9   claimant's residual functional capacity."  *Id.* at 31.  Judge Gill afforded great weight to Dr.

10  McMillian's opinion and afforded less weight to the consulting physicians who

11  "underestimat[ed]" W.W.'s functional ability.  *Id.*  Judge Gill again pointed to W.W.'s

12  "unremarkable" and "normal" physician examinations between 2015 and 2017.  *Id.*  Judge Gill

13  also explained that W.W.'s consultative examination with Dr. McMillan was also "unremarkable"

14  and gave the following explanation:

15          During the interview, the claimant reported no other problems apart
        from her abdominal issues. She did not require a cane for ambulation.
16          She had full range of motion and good grip strength. There was no
        edema in the lower extremities and no pain with gait. She had full
17          bilateral weight-bearing as well as normal deep tendon reflexes and
        straight leg raises.
18

19  *Id.*

20         Judge Gill further found W.W.'s inconsistencies weighed against her claim for disabling

21  impairments.  *Id.* at 31.  Judge Gill highlighted two inconsistent statements: (1) that W.W. stated

22  on August 16, 2016 that she had two dogs at home but later denied caring for pets, and (2) that she

23  denied drug use in February 2017 but reported daily marijuana use in July 2016.  *Id.*

24         Judge Gill then addressed the hearing testimony of the vocational expert Christopher

25  Salvo.  *Id.* at 32.  Based on the testimony, Judge Gill found that W.W. was capable of performing

26  her past relevant work as a customer service representative and a bank teller.  *Id.*  Judge Gill

27  provided the following analysis:

28         The vocational expert testified, given the residual functional capacity,

United States District Court
Northern District of California

> an individual with the same age, education, and work experience as the claimant could return to the claimant's prior work as a customer service representative (DOT 205.362-026) which is light, skilled work with a Specific Vocational Preparation (SVP) of six and bank teller [(]DOT 211.362-018) which is light, skilled work with a SVP of five.

*Id.* Judge Gill further found that W.W.'s past work was performed "recently," i.e., within fifteen years of the date of the decision, and exceeded the requirements for substantial gainful activity. *Id.* Judge Gill concluded it met the requirements for past relevant work. *Id.* Judge Gill then considered the vocational expert's testimony and compared W.W.'s "residual functional capacity with the physical and mental demands" of the past relevant work and made the following conclusion:

> After considering the testimony of the vocational expert, and in comparing claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds the claimant is capable of performing past relevant work, as was actually and is generally performed in the economy.

*Id.*

Judge Gill did not reach Step Five.

**H.   The Parties' Arguments**

In her motion for summary judgment, W.W. argues that she is entitled to benefits from her onset date of January 12, 2016, and requests remand for a new hearing. *See generally* Pl.'s Mot. (dkt. 31-2). First, W.W. argues that she is able to rebut the presumption of continuing nondisability because her depression has increased in severity and she alleges a new impairment, pre-diabetes. *Id.* at 3. W.W. contends that Judge Gill failed to give appropriate weight to her treating mental health providers, whose opinions show that her depression has increased in severity. *Id.* at 3. She argues that Judge Gill gave more weight to the non-examining opinions and consultative examiner opinions and "failed to give either clear or convincing or specific and legitimate reasons for rejecting [W.W.'s] treating sources." *Id.* at 4. In her view, that the reasons offered by Judge Gill are irrelevant and incorrect interpretations of the record. *Id.* at 4–5. W.W. also argues that Judge Gill failed to consider the evidence of her pre-diabetes, which was not present at the time of her prior decision. *Id.* at 7. Lastly, W.W. argues that Judge Gill erred at Step Four because he "failed to make explicit and necessary findings as to the physical and mental

United States District Court
Northern District of California

1    demands of [W.W.'s] past relevant work." *Id.* at 8 (heading capitalization altered).  Specifically,

2    she contends that Judge Gill did not make findings of fact required by SSR 82-62 as to how

3    W.W.'s past work was actually performed. *Id.*  She further argues that Judge Gill did not question

4    the vocational expert about the mental or physical demands of W.W.'s past work. *Id.* at 9–10.

5    W.W. requests that her case be remanded for further proceedings. *Id.* at 10.

6           The Commissioner argues Judge Gill's assessment of the medical record complied with

7    agency regulations and that substantial evidence supports Judge Gill's finding that W.W. did not

8    have a decrease in function after the prior decision.  Comm'r's Mot. (dkt. 35) at 4.  The

9    Commissioner contends that Judge Gill properly evaluated the medical evidence and that his

10   conclusions are free from legal error. *Id.* at 5–7.  The Commissioner also argues that W.W. failed

11   to show that her pre-diabetic symptoms were supported by the medical evidence and therefore

12   argues that W.W. failed to rebut the presumption of non-disability. *Id.* at 7–8.

13          Lastly, the Commissioner contends that Judge Gill properly found that W.W. could

14   perform her past relevant work. *Id.* at 9–10.  The Commissioner argues that it was reasonable for

15   Judge Gill to rely on Salvo's "uncontested testimony." *Id.* at 10.  The Commissioner

16   acknowledges that if Judge Gill had found that W.W. had cognitive or mental impairments, then

17   there may be an argument for a more robust finding on the specific mental demands of W.W.'s

18   past work. *Id.*  But the Commissioner argues that since Judge Gill did not find any mental

19   impairments, he did not need to make any findings as to the mental demands of W.W.'s past

20   relevant work. *Id.*

21          W.W. did not file a reply brief.

22   **III.    ANALYSIS**

23          **A.    Legal Standard**

24          District courts have jurisdiction to review the final decisions of the Commissioner and may

25   affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

26   hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

27          When reviewing the Commissioner's decision, the Court takes as conclusive any findings

28   of the Commissioner that are free of legal error and supported by "substantial evidence."

United States District Court
Northern District of California

Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014). Here, W.W. seeks only remand for further proceedings; she has not argued that the Court should remand with instructions to award benefits.

### B.    Whether the ALJ Erred in Weighting the Medical Evidence

W.W. argues that Judge Gill erred by failing to give appropriate weight to the opinions of her treating mental health providers: LCSW Youdon and Dr. McCall. Pl.'s Mot. at 4. The Court agrees.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)."[9] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); 20 C.F.R. § 416.927(d). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a

---

[9] Psychologists' opinions are subject to the same standards as physicians' opinions. *See* 20 C.F.R. § 404.1527(a); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

non-examining physician." *Garrison*, 759 F.3d at 1012.[10]  The medical opinion of a claimant's

treating physician is given "controlling weight" so long as it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).  When a

treating physician's opinion is not controlling, it is weighed according to factors such as the length

of the treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, supportability, consistency with the record, and specialization of the

physician.  20 C.F.R. § 404.1527(c)(2)–(6).  Where a treating or examining physician's opinion is

not contradicted by another doctor, an ALJ may reject it only for clear and convincing reasons that

are supported by substantial evidence.  *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir.

2008) (citations omitted).  Even when contradicted by another doctor, such opinions may only be

rejected for specific and legitimate reasons supported by substantial evidence in the record.  *Id.*

      Unlike physicians and psychologists, the regulations do not treat social workers as

"acceptable medical sources."  20 C.F.R. § 1527(a), (f); see 20 C.F.R. § 404.1520c for claims filed

on or after March 27, 2017.  Instead, the regulations treat "[p]ublic and private social welfare

agency personnel" as "nonmedical sources."  20 C.F.R. § 404.1502(e).  An ALJ may disregard the

opinion of a social worker, or other nonmedical source, only if the ALJ "'gives reasons germane to

each witness for doing so.'"  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)

(quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2011)).

### 1.    Dr. McCall

      Judge Gill erred in giving little weight to the opinions of Dr. McCall, W.W.'s treating

psychiatrist who had multiple appointments with W.W. over five months.  Judge Gill's

explanations for rejecting the opinion of Dr. McCall are not supported by substantial evidence and

instead conflict with the medical record.  *See Holohan v. Massanari*, 246 F.3d 1196, 1207 (9th

---

[10] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017.  *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c.  Because W.W. filed her application before that date, the older framework applies here, and this order need not consider what effect the regulatory change has on Ninth Circuit precedent regarding the weight afforded to different categories of medical opinion.

Cir. 2001) (holding that an ALJ's "specific reason for rejecting [a treating physician's] medical opinion [was] not supported by substantial evidence" where the ALJ "selectively relied on some entries in [the claimant's] records . . . and ignored the many others that indicated continued, severe impairment"). Judge Gill rejected Dr. McCall's opinion because the "record [did] not contain evidence of a history of altercations, evictions, firings due to interpersonal conflicts, fear of strangers, avoidance of interpersonal relationships or personal isolation." AR at 28. Judge Gill ignored, however, that Dr. McCall's reports that W.W. self-isolated were consistent with other evidence. *Id.* at 756. Specifically, LCSW Youdon reported that W.W. had gotten into a "heated argument" her hairdresser and W.W. testified that she suffers from personal isolation. *Id.* at 62–63, 719. Judge Gill also ignored W.W.'s treatment with PA Rene whose opinions were consistent with Dr. McCall's assessments that W.W.'s depression was not improving despite increasing the dosage of W.W.'s antidepressants. Judge Gill's selective focus on perceived conflicts in the record, without addressing consistent reports of isolation and serious depression that did not respond to medication, does not meet the high bar of specific and legitimate reasons to reject the opinions of a treating physician.

### 2.     LCSW Youdon

Judge Gill erred in giving little weight to LCSW Youdon, who had weekly therapy sessions with W.W. for almost two years. Because LCSW Youdon was a social worker, Judge Gill needed to provide "germane reasons" for disregarding her testimony. *See Lewis*, 236 F.3d at 511. Judge Gill found LCSW Youdon's opinion was inconsistent with the medical evidence and the medical opinions of Drs. Prosise, Kollath, Bergmann-Harms, and Funkenstein. Although inconsistency with medical evidence may be a germane reason, *see Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), LCSW Youdon's opinion was consistent with much of the record. As stated above, Judge Gill's reasoning that the record lacked evidence of interpersonal difficulty was not supported by the record and was inaccurate. Judge Gill also rejected LCSW Youdon and Dr. McCall's opinions because W.W. reported receiving a $20,000 home improvement loan from the City of Richmond but omits LCSW Youdon's later reports that W.W. was unable to manage the improvements on her own. *Id.* at 28, 692 (noting that W.W.'s niece had taken over the

improvements because it had become "too much").  Judge Gill also ignored two years of PHQ-9

testing conducted by Dr. McCall and LCSW Youdon which consistently demonstrated that W.W.

suffered from severe depression.  By failing to address LCSW Youdon's specific findings, Judge

Gill did not provide germane reasons for rejecting the opinions of LCSW Youdon, who had seen

W.W. longer than any other medical provider in the record and had provided detailed explanations

accompanying each weekly appointment over the course of W.W.'s two-year treatment.  *See* 20

C.F.R. § 404.1527(f)(2) (recognizing that a social worker's opinion may be entitled to more

weight than an acceptable medical source if the social worker "has seen the individual more often

than the treating source, has provided better supporting evidence and a better explanation for the

opinion, and the opinion is more consistent with the evidence as a whole").

### 3.  Dr. Prosise

Without reaching the question of whether this potential error would be sufficient on its

own for remand, it is not clear why Judge Gill gave great weight to the opinions of Dr. Prosise,

who evaluated W.W. in 2013—three years prior to her alleged onset date and outside the

applicable period of alleged disability.  Judge Gill rejected Dr. Friedmann's 2014 opinion because

it was "prior to the adjudicatory period."  AR at 28.  Judge Gill did not explain why it was

appropriate to give great weight to Dr. Prosise's opinion when it preceded Dr. Friedman's opinion

and was also "prior to the adjudicatory period."  *See id.*

### 4.  Dr. Kollath

Judge Gill's reasoning for giving Dr. Kollath's opinion great weight is not well supported.

The Commissioner argues that Judge Gill appropriately weighed Dr. Kollath's opinion because it

"was based on [Dr. Kollath's] own clinical examination" of W.W.  Comm'r's Mot. at 6.  But the

opinions of a doctor who conducts a one-time examination generally are entitled to less weight

than are the opinions of treating sources, who "'are likely to be the medical professionals most

able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may

bring a unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of . . . consultative examinations.'"  *Hunt v. Berryhill*, No.

16-cv-00313-JCS, 2017 WL 1177981, at *8 (N.D. Cal. Mar. 30, 2017) (quoting 20 C.F.R.

§ 404.1527(c)(2)).  In support of Dr. Kollath's opinion, Judge Gill stated that W.W. presented with good cognition at her examination and during the hearing.  AR at 28.  The fact that W.W. was "attentive" on two occasions is not substantial evidence justifying Judge Gill's rejection of W.W.'s treating providers.  *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (holding that a claimant does not "need to be utterly incapacitated in order to be disabled" (internal citations and quotation marks omitted)).

### 5.    Drs. Bergmann-Harms and Funkenstein

Judge Gill also erred in giving great weight to Drs. Bergmann-Harms and Funkenstein, the state agency physicians who did not treat or examine W.W.  Judge Gill did not explain why these physicians were entitled to greater weight compared to W.W.'s treating providers, and failed to address the fact that the state agency consultants did not review all of W.W.'s medical record before reaching their opinions, since their opinions were rendered before W.W. began treatment with Dr. McCall and over a year before the completion of W.W.'s two-year treatment with LCSW Youdon.  *See Herron v. Astrue*, 407 F. App'x 139, 141 (9th Cir. 2010) (holding that an ALJ erred in assigning great weight to the non-examining physician when that physician "did not review a substantial portion of the relevant medical evidence, including the records from [claimant's] treating physicians and nurse practitioner" (citing 20 C.F.R. §§ 404.1527(a)–(e), (f)(2)(ii))).

### C.    Whether the ALJ Erred in Applying the Presumption of Non-Disability

In the Ninth Circuit, an ALJ's finding that a claimant is not disabled "create[s] a presumption that [the claimant] continued to be able to work after that date."  *Lester*, 81 F.3d at 827 (quoting *Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir. 1985)).  While the principles of res judicata apply to administrative decisions, the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings.  *Chavez*, 844 F.2d at 693.  To overcome this presumption, a claimant must prove "changed circumstances indicating a greater disability."  *Id.* (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985)); *see also* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3 (Dec. 3, 1997) ("A claimant may rebut the presumption by showing a 'changed circumstance' affecting the issue of disability with respect to the unadjudicated period, e.g., a change in the claimant's age category under 20 C.F.R. 404.1563 or 416.963, an increase in

United States District Court
Northern District of California

1  the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not

2  previously considered, or a change in the criteria for determining disability.").  Under *Chavez*,

3  even if a claimant rebuts the continuing presumption of non-disability after a prior final

4  administrative decision, the Court is still required to give effect to certain findings contained in the

5  prior ALJ's decision, including findings in the five-step evaluation process for determining

6  disability.  *See* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3.

7  　　　　If the claimant produces "new and material evidence" that was not presented to the prior

8  ALJ, the presumption of non-disability will be successfully rebutted and the prior ALJ's findings

9  will not be entitled to res judicata.  *Id.*  Evidence is considered "material" when it "bear[s] directly

10  and substantially on the matter" and "there is a reasonable possibility that the new evidence would

11  have changed the outcome."  *Walters v. Colvin*, 213 F. Supp. 3d 1223, 1226–27 (N.D. Cal. 2016)

12  (quoting *Luna v. Astrue*, 623 F.3d 1032, 1033 (9th Cir. 2010)); *see also* HALLEX I-5-4-60

13  ("[N]ew evidence is 'material' if, for the purposes of adjudicating the current claim, the evidence

14  warrants a finding on residual functional capacity, education, work experience or other findings

15  required at a step in the sequential evaluation process different than that made in the decision on

16  the prior claim.").  Using this standard, the second ALJ must "determine whether [the claimant's]

17  current circumstances [are] different from those found by the first ALJ."  *Draiman v. Berryhill*,

18  No. CV 17-747-KS (KLS), 2018 WL 895445, at *4 (C.D. Cal. Feb. 13, 2018) (quoting *Johnson v.

19  Astrue*, 358 F. App'x 791, 792 (9th Cir. 2009)).

20  　　　　Here, W.W. contends that she has established two changed circumstances. She argues that

21  Judge Gill failed to consider her diagnosis of pre-diabetes which was not present at the time of the

22  prior decision.  Pl.'s Mot. at 7.  She also argues that Judge Gill failed to give appropriate weight to

23  the opinions of her treating mental health providers which demonstrate that her depression has

24  increased in severity.  *Id.* at 3–8.

25  　　　　First, the Commissioner does not dispute that W.W. was newly diagnosed with pre-

26  diabetes and argues instead that W.W.'s allegations of pre-diabetes is not sufficient to prove

27  changed circumstances because she must also show "greater disability."  Comm'r's Mot. at 9.

28  While the Commissioner is correct that "[a]n increase in severity of the claimant's impairment

1    would preclude the application of res judicata," it is also not appropriate to apply res judicata

2    where the claimant alleges new impairments. *See Lester*, 81 F.3d at 827 ("[T]he Commissioner

3    may not apply res judicata where the claimant raises a new issue, such as the existence of an

4    impairment not considered in the previous application."). The Ninth Circuit does not require a

5    claimant to establish a new and severe impairment in order to rebut the presumption of continuing

6    non-disability. *Vasquez v. Astrue*, 572 F.3d 586, 598 n.9 ("[A]ll an applicant has to do to preclude

7    the application of res judicata is raise a new issue in the later proceeding."). Accordingly, Judge

8    Gill erred in finding W.W.'s new impairment of pre-diabetes did not rebut the presumption of

9    continuing non-disability.

10       Second, as stated above, Judge Gill failed to give appropriate weight to W.W.'s treating

11   mental health providers whose opinions postdated the prior administrative hearing and

12   "necessarily presented new and material information not presented to the first ALJ." *See Stubbs-*

13   *Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008). LCSW Youdon opined that W.W. was

14   "more depressed than ever." *Id.* at 686. PA Rene and Dr. McCall increased W.W.'s prescription

15   multiple times. *Id.* at 709–11, 756. Dr. McCall also prescribed alternative antidepressants but

16   indicated that the medication was no longer effective in regulating W.W.'s depression:

17          Despite good medication adherence and medication adjustments and
            changes, [W.W.] continues to report feeling very depressed, anxious,
18          irritable, amotivated, with little interest in things, isolating because is
            easily annoyed.
19

20   *Id.* at 756. This differs from Judge Parnow's prior finding that W.W. was stable on her

21   antidepressants. *Id.* at 120. Furthermore, Judge Gill's finding that a new analysis was warranted

22   is sufficient to show that the evidence was "material." *See* HALLEX I-5-4-60. Accordingly,

23   Judge Gill erred in finding that W.W. failed to rebut the presumption of continuing non-disability.

24       **D.    Whether the ALJ Erred in Failing to Address the Requirements of Past**
           **Relevant Work**
25

26       At Step Four, "claimants have the burden of showing that they can no longer perform their

27   past relevant work." *Pinto v. Massanari*, 249 F.3d 840, 844–45 (9th Cir. 2001) (citing 20 C.F.R.

28   §§ 404.1520(e) and 416.920(e)); *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990)). "Although

*United States District Court*
*Northern District of California*

the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion." *Id.* (citing SSR 82-62; 20 C.F.R. §§ 404.1571 and 416.971, 404.1574 and 416.974, 404.1565 and 416.965.3). In *Pinto v. Massanari*, the Ninth Circuit explained that "[t]his is done by looking at the 'residual functional capacity and the physical and mental demands' of the claimant's past relevant." *Id.* (citing 20 C.F.R. §§ 404.1520(e) and 416.920(e)).

Under SSR 82-61, a claimant is capable of performing past relevant work if the claimant can perform either: "1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61. Regardless of which test is applied, where an ALJ makes a finding of disability on this basis, the ALJ must make "specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work." *Pinto*, 249 F.3d at 845 (citing SSR 82-62).

SSR 82-62 underscores the importance of specific factual findings at this stage of the analysis, noting that "[s]ince this is an important and, in some instances, a controlling issue," the ALJ's determination has "far-reaching implications and must be developed and explained fully." SSR 82-62, 1982 WL 31386, at *3. It elaborates:

> Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.* Failure to make specific factual findings in support of the conclusion that a claimant can perform past relevant work constitutes legal error that warrants reversal. *See Pinto*, 249 F.3d at 847 ("[R]equiring the ALJ to make specific findings on the record at each phase of step four analysis provides for meaningful judicial review. When . . . the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the

1   [vocational expert's] head, we are left with nothing to review." (quoting *Winfrey v. Chater*, 92

2   F.3d 1017, 1025 (10th Cir. 1996)) (some alterations in original)).

3      Judge Gill determined that W.W. was capable of performing her past relevant work as a

4   customer service representative and a bank teller "as was actually and is generally performed in

5   the economy."  AR at 32.  W.W. argues that Judge Gill erred in failing to make any findings as to

6   the specific requirements of the physical or mental requirements of W.W.'s past work.  The

7   Commissioner argues that Judge Gill did not need to make any findings as to the mental demands

8   of W.W.'s work because Judge Gill found W.W. did not have any mental impairments.  Comm'r's

9   Mot. at 10.  As stated above, Judge Gill erred in weighing the medical evidence and the Court is

10  not convinced that substantial evidence supports Judge Gill's finding of no mental impairments.

11  Based on the current record, the Court cannot determine whether W.W. is capable of performing

12  past work as was actually or is generally performed in the economy, whether the mental demands

13  of that past work are relevant to the inquiry, or whether W.W. is capable of performing any other

14  kind of substantial gainful work which exists in the national economy.  Accordingly, further

15  proceedings are required.

16  **IV.    CONCLUSION**

17      For the reasons stated above, W.W.'s motion is GRANTED and the Commissioner's

18  motion is DENIED.  The Court reverses the ALJ's decision and REMANDS W.W.'s claim for

19  further administrative proceedings consistent with this order.  The Clerk shall enter judgment in

20  favor of W.W. and close the case.

21      **IT IS SO ORDERED.**

22  Dated: September 24, 2021

23  _____

24  JOSEPH C. SPERO
    Chief Magistrate Judge

25

26

27

28

30